# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| CLIFTON KIRVEN, RONALD YEARGIN and JANIE YEARGIN, on behalf of themselves and all other persons and entities similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> CORTEVA, INC.; SYNGENTA CROP PROTECTION AG; SYNGENTA CORP.; SYNGENTA CROP PROTECTION, LLC <br><br> Defendants. | CIVIL ACTION NO. 1:23-cv-268 <br><br> **JURY TRIAL DEMANDED** |

# CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................. 1

JURISDICTION AND VENUE .......................................................................... 6

INTERSTATE COMMERCE ............................................................................ 7

PARTIES ............................................................................................................ 8

FACTUAL ALLEGATIONS ............................................................................ 10

    I.    OVERVIEW OF THE CROP PROTECTION INDUSTRY ................ 10

        A.    Crop Protection Products ............................................................ 10

        B.    Crop Protection Product Manufacturers .................................... 12

        C.    The Regulatory Process for Crop Protection Products .............. 13

        D.    The Traditional Distribution Channel ....................................... 15

        E.    Life Cycle Management of Crop-Protection Products ............... 17

    II.    DEFENDANTS' ANTICOMPETIVE ACTIONS ................................ 18

        A.    Corteva's Loyalty Program ........................................................ 20

        B.    Syngenta's Loyalty Program ...................................................... 23

        C.    Market Effects of Loyalty Programs .......................................... 27

            1.    Corteva CPPs Subject to Corteva's Loyalty Program ...... 31

                i.    Rimsulfuron ............................................................. 31

                ii.    Oxamyl ................................................................... 33

                iii.    Acetochlor ............................................................. 35

            2.    Syngenta CPPs Subject to the Key AI Loyalty Program . 39

                i.    Azoxystrobin ........................................................... 39

                ii.    Mesotrione ............................................................. 41

                iii.    Metolachlor ........................................................... 44

RELEVANT MARKETS ...................................................................47

ANTITRUST INJURY ...................................................................52

CLASS ACTION ALLEGATIONS.................................................53

CONTINUING VIOLATIONS AND FRAUDULENT CONCEALMENT .......59

CLAIMS FOR RELIEF .................................................................62

    COUNT ONE  VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) (Against All Defendants) ..................................................62

    COUNT TWO VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) —MONOPOLIZATION (Against Corteva).....................65

    COUNT THREE VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) —MONOPOLIZATION (Against Syngenta).............68

    COUNT FOUR VIOLATION OF STATE ANTITRUST LAWS IN THE ALTERNATIVE TO SHERMAN ACT CLAIMS  (Against All Defendants)..........................................................70

    COUNT FIVE VIOLATION OF STATE CONSUMER PROTECTION LAWS IN THE ALTERNATIVE TO SHERMAN ACT CLAIMS (Against All Defendants)....................................................74

    COUNT SIX VIOLATION OF § 3 OF THE CLAYTON ACT (15 U.S.C. § 14)  (Against All Defendants...........................................77

    COUNT SEVEN UNJUST ENRICHMENT  (Against All Defendants).....78

PRAYER FOR RELIEF.................................................................79

DEMAND FOR JURY TRIAL .......................................................80

Plaintiffs Clifton Kirven, Ronald Yeargin and Janie Yeargin ("Plaintiffs") bring this action on behalf of themselves and a proposed Class of similarly situated direct purchasers of certain crop protection products ("CPPs") manufactured by Defendant manufacturers Corteva, Inc. ("Corteva") and Syngenta Crop Protection AG, Syngenta Corp., and Syngenta Crop Protection, LLC (collectively, "Syngenta," and collectively with Corteva, the "Defendants"), and the generic versions of those CPPs. Plaintiffs and the proposed Class were harmed by having to purchase CPPs at prices that were inflated due to Defendants' anticompetitive conduct as alleged herein. Plaintiffs allege as follows based on personal knowledge, the investigation of Plaintiffs' counsel, on the allegations in the Federal Trade Commission's Amended Complaint dated December 23, 2022, in *FTC v. Syngenta Crop Protection AG,* No. 22 Civ. 00828 (M.D.N.C.) [ECF No. 79], and on information and belief.

## NATURE OF THE ACTION

1. Defendants Corteva and Syngenta each manufacture CPPs, including agricultural pesticides, herbicides and fungicides, that are used by many American farmers. For many years, Defendants Syngenta and Corteva have unfairly impeded competitors and artificially inflated the prices that U.S. farmers pay for crop-protection products. Defendants do this by deploying a set of so-called "loyalty programs," which are designed to severely limit the availability of lower-priced generic products. Through this scheme, Defendants

have suppressed generic competition and maintained monopolies long after their lawful exclusive rights to particular crop-protection products have expired. These unlawful business practices have cost farmers many millions of dollars a year on their purchases of CPPs containing active ingredients rimsulfuron, oxamyl, acetochlor, azoxystrobin, mesotrione, metolachlor, or s-metolachlor (the "Relevant AIs"). CPPs containing the Relevant AIs are referred to herein as the "Relevant CPPs."

2. Every year, U.S. farmers purchase over ten billion dollars of CPPs to improve crop yields and food security in the United States.

3. Defendants manufacture CPPs that contain unique active ingredients. A CPP manufacturer that researches, develops, and patents new active ingredients is known as a "basic" manufacturer. Syngenta and Corteva are basic manufacturers, and they are among the largest crop-protection product manufacturers in the United States and globally. In 2021, Syngenta had $3.03 billion in CPP sales in North America and $13.3 billion globally.[1] Corteva had $2.5 billion in CPP sales in North America and $7.25 billion globally.[2]

---

[1] *Financial Report 2021*, Syngenta, 6 (2021), https://www.syngenta.com/ sites/syngenta/files/bond-investor-information/financial-results/Syngenta-AG-2021-Financial-Report.pdf.

[2] *Keep Growing, Corteva Annual Report 2021*, Corteva Investors, 1 (2021), https://investors.corteva.com/static-files/fb19f308-4766-4ca6-a3d6-bd0a8035f09a.

4.      Defendants' CPPs and the active ingredients therein enjoyed a period of patent protection and regulatory protection under which they were lawfully protected from competition.  Congress has enacted a comprehensive regulatory regime for the crop-protection industry that promotes the twin goals of product innovation and price competition.  "Basic" manufacturers like Defendants Syngenta and Corteva initially develop, patent, and register the active ingredients within crop-protection products.  They may then exploit the commercial potential of their innovations through lawfully obtained exclusive rights for a period of years.  After patent and regulatory exclusivity periods expire, generic manufacturers may enter the market with equivalent products containing the same active ingredients and relying upon the same toxicology and environmental impact data.  Unimpeded competition from generic products predictably leads to dramatic price reductions.  This regulatory structure thus incentivizes innovation while encouraging price and other competition— all of which benefits U.S. farmers and consumers.

5.      Defendants systematically undermine and frustrate the goals of this system.  In order for Defendants Corteva and Syngenta to maintain their market dominance even after their patent and regulatory exclusivities on their CPPs expired, Defendants used "loyalty programs" under which they made substantial payments to their wholesalers, and in certain cases also retailers, in exchange for the wholesalers and retailers agreeing to strictly limit their

purchases of generic versions of Defendants' CPPs. Defendants promise the distributor a complex set of incentive payments based on its purchases of branded CPPs, paid as one sum at the end of the year on one critical condition: the distributor must limit its purchases of comparable generic products to a set percentage share, usually 15% or less, and sometimes as low as 0%. Defendants call this a "rebate" for "loyalty." In reality, however, these are exclusion payments to distributors. Defendants pay a portion of their monopoly profits to distributors in exchange for the distributors excluding Defendants' generic competitors, resulting in near-exclusivity for Defendants. These loyalty programs ensured that Defendants' far more expensive branded CPPs would comprise the majority of sales to wholesalers, retailers, and their respective customers.

6. Since a small number of wholesalers control a very large share of all sales of CPPs to retailers that sell to farmers, and some of the wholesalers also own a large number of their own retail outlets, loyalty programs in effect for a particular CPP foreclose generic CPP manufacturers from nearly all of the retail market for that CPP. The other channels available to generic CPP manufacturers to deliver their products to market are far more limited. When there is a loyalty program in place for a particular CPP, the generic CPP manufacturers can typically only sell much smaller volumes of that CPP, or

often cannot sell it profitably at all, requiring them to exit the market or to not enter it in the first place.

7.     Defendants' "loyalty payment" system has the following effects: (1) the Defendants are able to maintain a monopoly or near-monopoly for the sales of each of these CPPs even though the patent and regulatory protection have expired and there should be open competition from generics; (2) the Defendants are able to continue to charge much higher prices for those CPPs as a result of excluding most generic competition; (3) the Defendants obtain supracompetitive profits as a result; (4) the Defendants share part of those supracompetitive profits with wholesalers and/or retailers to ensure their cooperation with this scheme; (5) farmers have to pay much higher prices for those branded CPPs than they would if there was the open competition that would occur absent Defendants' conduct; and (6) the lesser amounts of generic versions of those CPPs that are able to be sold are also priced higher than they would be if there was the open competition that would occur absent Defendants' conduct.

8.     Defendants' anticompetitive scheme has reduced competition in the market for the CPPs discussed herein and thereby artificially inflated the price of those CPPs and of the generic competitors to those CPPs.  Plaintiffs and members of the proposed Class have been injured by paying artificially inflated prices for their CPP purchases.

9. On September 29, 2022, following an investigation, the FTC filed a complaint against Defendants alleging that Defendants' loyalty programs foreclose generic competition and result in higher prices for farmers in violation of federal and state antitrust laws.[3]

## JURISDICTION AND VENUE

10. Plaintiffs bring claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and Section 3 of the Clayton Act, 15 U.S.C. § 14, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. Plaintiffs also brings state law class claims on behalf of the Class to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post- judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct.

11. This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337(a). This Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $5,000,000 and Plaintiffs and members of the class are citizens of a different state than Defendants.

---

[3] Complaint, *FTC v. Syngenta Crop Protection AG*, 22 Civ. 00828 (M.D.N.C. Sept. 29, 2022), ECF No. 1.

12.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ 15 and 22, as Defendants reside, transact business, committed an illegal or tortious act, have agents, and/or can be found, in this District.

13.     This Court has personal jurisdiction over Defendants because each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pesticides throughout the United States, including in this District; (c) had substantial contacts within the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

## INTERSTATE COMMERCE

14.     Defendants engage in interstate commerce and activities substantially affecting interstate commerce in the national market for CPPs. Defendants Corteva and Syngenta sell their CPPs to wholesalers, who sell them to retailers, who sell them to farmers in all 50 states. Defendants' manufacture, distribution, and sale of CPPs involves a continuous and uninterrupted flow of commerce across state lines. Defendants' anticompetitive actions have had a

substantial effect on interstate trade and commerce in the markets for the CPPs discussed herein.

## PARTIES

15. **Plaintiff Ronald Yeargin** is a resident of Tennessee.

16. **Plaintiff Janie Yeargin** is a resident of Tennessee. Plaintiffs Ronald and Janie Yeargin shall be referred to collectively herein as "the Yeargins." During the Class Period, the Yeargins purchased CPPs containing metolachlor, s-metolachlor, azoxystrobin, rimsulfuron and mesotrione, including products manufactured by Defendant Corteva and Defendant Syngenta, from Weakley Farmers Coop and Helena Chemical Co., at prices that were artificially inflated as a result of Defendants' anticompetitive scheme, and thereby suffered antitrust injury.

17. **Plaintiff Clifton Kirven** is a resident of Illinois. During the Class Period, Kirven purchased CPPs containing s-metolachlor, azoxystrobin, acetochlor, and mesotrione, including products manufactured by Defendant Syngenta from Nutrien, at prices that were artificially inflated as a result of Defendants' anticompetitive scheme and thereby suffered antitrust injury.

18. **Defendant Corteva, Inc.** is a publicly held Delaware corporation based in Indianapolis, Indiana. Corteva is the successor company to the agriscience businesses of E.I. du Pont de Nemours ("DuPont") and Dow Chemical Company ("Dow"), which merged to form DowDupont in 2017, and subse-

8

quently split into Corteva and Dupont in 2019. Corteva is involved in the research and development, manufacture, sale, and marketing of CPPs and transacts, or has transacted business in this District.

19. **Defendant Syngenta Crop Protection AG** is a Swiss aktieng-esellschaft (public limited company), headquartered in Basel, Switzerland. Since in or about May 2021, Syngenta Crop Protection AG has been an indirect subsidiary of Sinochem Holdings Corporation Ltd., a global chemical company based in Beijing, China. Syngenta Crop Protection AG has its North American headquarters in Greensboro, NC, in this District. Syngenta Crop Protection AG has directed, overseen, and approved Syngenta's sales and marketing strategy. Syngenta Crop Protection AG's North American headquarters is located in its 70-acre campus in Greensboro, North Carolina.

20. **Defendant Syngenta Corporation** is a Delaware corporation headquartered in Wilmington, Delaware and is an affiliate of Syngenta Crop Protection AG.

21. **Defendant Syngenta Crop Protection, LLC** is a Delaware LLC based in Greensboro, North Carolina and is an affiliate of Syngenta Crop Protection AG.

22. Defendants Syngenta Crop Protection AG, Syngenta Corp. and Syngenta Crop Protection, LLC each transact or transacted business in this District, and each of them is involved in the research and development, manu-

facture, sale, and marketing of CPPs. Syngenta Crop Protection AG, Syngenta Corp. and Syngenta Crop Protection, LLC function as a single enterprise, both structurally and operationally. Syngenta's global management approves the appointment of senior executives for all Syngenta Group companies, including Syngenta Crop Protection, LLC, and determines what authority is delegated to the local level. For example, Syngenta Crop Protection, LLC cannot settle significant litigation without approval from Syngenta's global management. According to Vern Hawkins—the President of Syngenta Crop Protection, LLC, President of Syngenta Corporation, and North America Regional Director for Crop Protection for the overall Syngenta enterprise—Syngenta has "a global strategy philosophy" and "a local implementation and execution implementation plan."

**FACTUAL ALLEGATIONS**

**I.      OVERVIEW OF THE CROP PROTECTION INDUSTRY**

      **A.      Crop Protection Products**

23.      A pesticide is a chemical used to kill or control a "pest"—a disease, weed, insect, or other unwanted organism. The large majority of pesticides sold in the United States are used for crop protection.

24.      Farmers (or "growers") use pesticides to control pests that would otherwise harm their crops. Pesticides used for crop protection are referred to herein as "crop protection products" (previously defined as, "CPPs"). CPPs are

vitally important inputs for American farmers. Use of effective crop-protection products allows farmers to dramatically increase crop yields and quality, contributing to a stable food supply.

25. CPPs fall into three main categories: herbicides, which target unwanted plants or weeds; insecticides, which target insect infestations (including nematicides, which target nematodes (roundworms)); and fungicides, which target fungal diseases.

26. A CPP contains at least one active ingredient, which is the chemical substance that kills or controls the targeted pest. Active ingredients are combined with inert components such as water, adjuvants, surfactants, and in some cases other active ingredients, to formulate finished crop-protection products. Finished CPPs that contain only one active ingredient are referred to as "straight goods," while products containing two or more active ingredients are called "mixtures."

27. An active ingredient may also be sold in "technical grade" or for "manufacturing use," before being formulated into a finished CPP. Active ingredients sold in this form require additional processing before they can be used by farmers in finished CPPs.

28. Several criteria serve to distinguish active ingredients from each other. These include the pest(s) targeted by an active ingredient; the effectiveness of an active ingredient at controlling the targeted pest, which is often

measured in terms of crop yield improvements; the crops upon which an active ingredient is suited and registered to be used, which may correlate with geography; the stage of the growing cycle at which an active ingredient may be used; and the performance of an active ingredient under prevailing climate and weather conditions.

29.     Each active ingredient has what is referred to as a "mode of action," which is the chemical and biological sequence of events that causes a pesticide to kill or control the targeted pest.  While active ingredients that share a common mode of action tend to have similar use cases, there are often differences in performance and other reasons why one active ingredient cannot readily replace another for a given application or in a given condition.  Farmers may prefer one active ingredient over another for various reasons, including the specific performance characteristics of the active ingredient or a farmer's past success with an active ingredient.  As a result, a chemically equivalent generic crop protection product is a closer substitute for a given branded product than is a product containing a different active ingredient.

## B.     Crop Protection Product Manufacturers

30.     CPP manufacturers create, market, and sell crop protection products.  They may synthesize the active ingredients for their formulated products in their own facilities or purchase the active ingredients from other chemical manufacturers.

31.     A CPP manufacturer that researches, develops, and patents new active ingredients is known as a "basic" manufacturer. Syngenta and Corteva are basic manufacturers, and they are among the largest crop-protection product manufacturers in the United States and globally. In 2020, Syngenta was the second-largest CPP manufacturer in the United States by revenue, and Corteva was the third-largest.

32.     Generic manufacturers primarily sell CPPs containing active ingredients initially developed by others and as to which patent and regulatory exclusive-use periods have expired (sometimes called "post-patent" active ingredients). More than a dozen generic manufacturers sell CPPs in the United States.

### C.     The Regulatory Process for Crop Protection Products

33.     The congressionally enacted patent and regulatory framework governing crop protection products rewards innovation by granting the developer of a new active ingredient protection from competition in that active ingredient for a period of years. But the governing legal framework also contains mechanisms intended to facilitate generic entry and price competition when exclusivity periods end.

34.     The Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C.S. § 136a, *et seq.* ("FIFRA"), is a federal regulatory scheme that also seeks to reward innovation while guaranteeing the safety of CPPs. FIFRA

generally requires that a CPP be registered with the EPA before it can be sold or distributed.

35.    In order to sell or distribute a CPP in the United States, a manufacturer must conduct research studies about the CPP's toxicity and environmental impact, and then submit that information to the Environmental Protection Agency ("EPA"), and the EPA reviews that information prior to approving that CPP. *See* FIFRA **§** 3(c)(1)(F)(ii).  FIFRA allows applicants that register pesticides with new active ingredients the right to "exclusive use" of any data used to support the registration of a new ingredient for a period of ten years that can be extended under certain circumstances.   FIFRA § (c)(1)(F)(i)-(ii).  The exclusive use period precludes other companies from relying on the data and studies submitted during the exclusive use period.

36.    When a basic manufacturer develops a new active ingredient, it can apply for U.S. patent protection for a term beginning when the patent issues and expiring twenty years after the initial patent application.

37.    The effect of the exclusive use period is that the basic manufacturer that obtains the approval has a ten-year exclusive period that can and often does last after the expiration of the patent.  This regulatory exclusive-use period often extends beyond the basic manufacturer's patent term and effectively extends the basic manufacturer's right to be the exclusive supplier of products containing that active ingredient.

38.    After both the patent protection and FIFRA ten-year period on an active ingredient have expired, a generic manufacturer can get approvals to enter the market by using the same data that the basic manufacturer originally submitted.  This process is a much faster, easier, and less expensive than a company having to conduct its own research studies.

39.    When the basic manufacturer's relevant patent and regulatory exclusive-use terms expire, a generic manufacturer may enter the market with CPPs containing the same active ingredient.  Those products may be generic equivalents of branded CPPs or may combine the active ingredient with other active ingredients to create new mixtures.  A generic entrant must apply to register its product for sale in the United States under FIFRA, but FIFRA permits generic entrants to rely on data that the original registrant submitted to the EPA.  The original registrant, in turn, may be entitled to receive data "compensation" payments from the generic firm, depending on the timing of the generic entrant's reliance on the data.  This reflects FIFRA's objective of facilitating generic entry and thus encouraging competition.

## D.    The Traditional Distribution Channel

40.    In general, CPP manufacturers sell to distributors that in turn sell to (and in some cases are integrated with) a much larger number of retail outlets dispersed across the country in close proximity to farmers.  This path to market is referred to as the traditional distribution channel, or just the

"channel." Sales through the traditional distribution channel account for approximately 90% or more of all sales of crop-protection products in the United States. Just seven distributors account for over 90% of sales through the traditional channel, and thus account for approximately 80% or more of all sales of crop-protection products in the United States.

41. Selling through distributors is the most efficient way for a CPP manufacturer to reach farmers because:

    (a)    Distributors typically offer services and functions such as warehousing, transportation, credit, and marketing;

    (b)    Distributors give manufacturers access to a network of retail and farmer customers, and to the logistics networks required to service widely dispersed customers. By selling through a relatively small number of distributors, a CPP product manufacturer can reach thousands of retailers, and in turn, hundreds of thousands of farms; and

    (c)    Distributors provide scale and services that would require substantial investments for a manufacturer to replicate. CPP manufacturers cannot efficiently compete by circumventing the traditional distribution channel and focusing primarily on direct sales to local retailers or farmers.

42. Farms and farmers then buy CPPs from those retail outlets.

43.     This "traditional" distribution channel is responsible for about 90% of all sales of CPPs in the United States.

44.     The wholesalers are by far the best way for a CPP manufacturer to reach the target market of farmers.  A CPP manufacturer only has to sell through a few large wholesalers to access a large percentage of all retail outlets serving the vast majority of American farmers.  The wholesalers either own their own retail stores or have longstanding relationships with retailers that facilitate their sales of CPPs, and they have a massive infrastructure to support their distribution and sales of CPPs, including logistics, storage facilities, financing, and promotions.  CPP manufacturers would encounter huge difficulties and costs trying to develop those capabilities on their own, and it would be far less efficient for them to try to sell directly to retailers or farmers.

### E.     Life Cycle Management of Crop-Protection Products

45.     Generic CPPs are generally sold at significantly lower prices than equivalent branded products.  Accordingly, to the extent generic manufacturers are able to gain market access with respect to a given active ingredient, their entry generally sparks price competition and causes the price and sales volume of branded products containing that active ingredient to decline.  This in turn causes the associated profits of basic manufacturers to decline.

46.     Brand manufacturers engage in corporate strategy planning called "life cycle management" for a branded CPP.  This can be done in a perfectly

legal and pro-competitive manner, such as determining how a CPP's pricing should change, and how much in promotional expenses should be devoted to that CPP, at different points in its exclusivity period. However, it can also involve anticompetitive methods designed to prevent or delay generic entry or prevent generic entrants from being able to access the market effectively.

47. In response to actual or expected generic entry with respect to an active ingredient, Defendants have employed "generic defense" strategies (sometimes also referred to as "post-patent" strategies). These strategies are designed to inhibit entry of generic CPPs after the end of patent and regulatory exclusivity, and to minimize the competitive impact of such entry on the prices and market shares of branded products containing the same active ingredient. For both Syngenta and Corteva, loyalty programs have been a central component of the companies' generic defense strategies.

## II. DEFENDANTS' ANTICOMPETIVE ACTIONS

48. Corteva and Syngenta each use "loyalty programs" that are designed to severely limit the distribution of—and ultimately, farmers' ability to purchase—competing generic products. Corteva and Syngenta designed and administer their loyalty programs with the purpose, intent, and expectation that the program will impede generic competition and thereby maintain market prices and branded market share at levels higher than would otherwise prevail, despite the expiration of applicable patent and regulatory exclusive-

18

use terms.  Each does so for its own benefit and for the benefit of its distribution partners.

49.    The Defendants' loyalty programs were established with the intention of maintaining monopoly or near-monopoly exclusivity for their CPPs even after the patent and regulatory protection on those CPPs expired.

50.    The loyalty programs involve a Manufacturer Defendant making large payments to wholesalers or retailers that agreed to strictly limit its purchases of certain generic CPPs that would compete with the Manufacturer Defendant's CPPs that have lost patent and regulatory protection.  These large "bonus" payments were a conduit for the Defendants to share monopoly profits with wholesalers and retailers in order to secure their cooperation with the scheme described herein.  The payments are generally calculated as a percentage of a distributor's total purchases or sales of certain branded crop-protection products containing relevant active ingredients.

51.    Corteva and Syngenta's loyalty programs are designed to marginalize generic manufacturers and enable Defendants to retain share while pricing their CPPs above competitive levels.  As to the Relevant CPPs, Defendants have substantially achieved these goals.  Through its loyalty program, each Defendant has substantially impeded generic manufacturers from providing effective competition and has maintained prices for the Relevant CPPs above competitive levels.

52.     Corteva and Syngenta's loyalty programs generally allow distribu-tors to deal in a small amount of generic product containing a covered active ingredient, expressed as a percentage of the customer's total purchases or sales of the active ingredient.  The amount of generic product that a customer may deal in without forfeiting at least part of the exclusion payment is referred to as "open space" or "head space."  The open space for an active ingredient is typically 15% or less of the distributor's total purchases or sales of the active ingredient—*i.e.*, distributors must be 85% (or more) "loyal" to Syngenta or Corteva to obtain exclusion payments.

53.     Syngenta and Corteva typically have added an active ingredient to their existing loyalty programs either shortly before, or upon, the expiration of that active ingredient's patent or FIFRA exclusivity period or when faced with the threat of generic competition after such expiration.

54.     Further, those small quantities of generic versions of the Relevant CPPs that are still able to be sold are significantly more expensive, due to the fact that output in those markets is significantly restricted and prices are artificially higher as a result, allowing generic manufacturers to price their products significantly higher than they would in the event of open competition.

### A.     Corteva's Loyalty Program

55.     Corteva operates two related programs that condition exclusion payments  to distributors on meeting loyalty thresholds for specified active

ingredients. First, Corteva operates a program known as the "Crops, Range & Pasture and Industrial Vegetation Management (IVM) Loyalty Program" ("CRPIVM Loyalty Program"). The CRPIVM Loyalty Program is implemented through written agreements with participating distributors. Second, Corteva operates a program known as the "Corporate Distributor Offer" (or "Corporate Offer"). The Corporate Offer is implemented through written offers that participating distributors accept by complying with the terms of the offers, *i.e.*, through performance.

56. Corteva's loyalty program is intended to, and does in fact, exclude or minimize generic competition for Corteva CPPs that have lost patent and regulatory exclusivity. It is designed to maintain "value"—higher prices and profits—for both Corteva and its distributor partners by preventing the "value" deterioration associated with generic entry. In other words, the aim of the program is to maintain high prices and shares. To qualify for an exclusion payment for a given active ingredient in a given market year under the CRPIVM Loyalty Program, a distributor must source a certain percentage of its purchases of that active ingredient from Corteva. The specified threshold is generally at least 85%, depending on the active ingredient. Therefore, the open space for competing generic CPPs in Corteva's program is generally no greater than 15%. For most active ingredients, a distributor can also reap a larger payment by meeting a second, higher threshold. Corteva calculates the

distributor's achieved loyalty level by measuring the distributor's purchases of the active ingredient from Corteva as a percentage of the distributor's total purchases of the active ingredient (*i.e.*, units of active ingredient purchased from both Corteva and non-Corteva—typically generic—sources). In some cases, such as where a product containing a given active ingredient is not marketed for use on crops, Corteva will treat a product as "neutral" and exclude it from this calculation.

57. Corteva generally makes a single CRPIVM Loyalty Program exclusion payment to distributors at the end of the year. Because exclusion payments under the CRPIVM program are calculated as a percentage of all of the distributor's eligible purchases during the market year, a distributor that makes a single purchase of a single product that causes it to miss an active-ingredient threshold stands to lose exclusion payments associated with many purchases of many products that contain that active ingredient. The percentage that Corteva pays varies by year, by active ingredient, and by threshold level.

58. Under Corteva's loyalty program, wholesalers must make a very high percentage of their purchases of each of those CPPs from Corteva to get loyalty payments, thereby causing them to limit their purchases of generic competitors of those CPPs to a very low percentage share of their overall purchases of those CPPs.

59. As a result of excluding or minimizing generic competition, Corteva is able to continue to charge high prices for its CPPs even after they have lost patent and regulatory exclusivity, and still maintain high market share, allowing it to gain supracompetitive profits that it would not receive if there was open competition with generic competitors across the distribution chain.

60. Corteva uses these incentive payments to wholesalers (including wholesalers who operate retail outlets) to encourage the cooperation of wholesalers in this scheme, sharing part of its supracompetitive profits with them in exchange for their role in excluding generic competition and allowing those supracompetitive profits to continue.

## B. Syngenta's Loyalty Program

61. Syngenta's loyalty program is called the "Key AI" program.

62. Syngenta allows both wholesalers and retailers to participate in the Key AI program.

63. The Key AI program is intended to, and does in fact, exclude or minimize generic competition for Syngenta CPPs that have lost patent and regulatory exclusivity.

64. Under the Key AI program, Syngenta's branded CPPs must represent a very high percentage of wholesalers and retailers' purchases of those CPPs to receive loyalty payments, thereby causing them to limit their

purchases of generic competitors of those CPPs to a very low percentage share of their overall purchases of those CPPs. These agreements are signed by Syngenta Crop Protection, LLC.

65. To qualify for an exclusion payment for a given active ingredient in a given market year (running from October 1 through September 30), a distributor must source a certain percentage of its purchases or sales of that active ingredient from Syngenta rather than from generic manufacturers. The specified threshold is usually 85% or more, and it can be as high as 99%, *i.e.*, the open space for generic competition is usually no greater than 15% and can be as low as 1%.

66. Syngenta calculates a distributor's loyalty performance for a given year as follows: the numerator is the amount of active ingredient contained in "qualification-eligible" products purchased or sold by the distributor in the year. These include Syngenta-branded products and certain non-Syngenta products for which the active ingredient is sourced from Syngenta, either in a finished CPP or as a technical-grade or manufacturing-use active ingredient. The denominator consists of the same qualification-eligible active ingredient amount, plus the amount of non-Syngenta (typically generic) active ingredient purchased or sold by the distributor. In some cases, particularly where another basic manufacturer's product uses Syngenta-sourced active ingredient, Syngenta will treat the product as "neutral" under the Key AI program, count-

ing the corresponding active ingredient amounts in neither the numerator nor the denominator.

67. By restricting its use of generic products to satisfy the specified loyalty threshold, a distributor is eligible to reap various "special marketing bonuses" (exclusion payments) under its Syngenta marketing agreement. Although these payments differ by year, by active ingredient, and by distributor, and are subject to complex calculations and additional conditions, they generally amount to a high single-digit or greater percentage of the distributor's purchases or sales of eligible Syngenta-branded products during the market year. Thus, a distributor or retailer that makes a single purchase of a single product that causes it to miss an active-ingredient threshold stands to lose exclusion payments associated with many purchases of many products that contain that active ingredient. Syngenta generally makes a single exclusion payment to each distributor at the end of the year.

68. The active ingredients included in distributor marketing agreements can vary by year and across distributors, as can the associated share thresholds and calculation methods, but generally Syngenta applies similar loyalty thresholds across all distributors.

69. In addition to its distributor loyalty program, Syngenta also requires retailers to meet loyalty thresholds to receive exclusion payments under its retail Key AI program. The stated intent of this program is to

"[r]eward Retailers for their support of Syngenta products where a generic alternative exists," and to "defend[] Syngenta's market share position."

70. Syngenta's retail Key AI program operates in a manner similar to its distributor program, including conditioning additional exclusion payments on the retailer limiting generic purchases of specified active ingredients. The Key AI program generally offers loyal retailers an exclusion payment of 5% of total eligible purchases of covered Syngenta products. Participating retailers accept Syngenta's offers by complying with the terms of the offers, *i.e.*, through performance.

71. As a result of excluding or minimizing generic competition, Syngenta is able to continue to charge high prices for its CPPs even after they have lost patent and regulatory exclusivity, and still maintain high market share, allowing it to gain supracompetitive profits that it would not receive if there was open competition with generic competitors across the distribution chain.

72. Syngenta uses these incentive payments to wholesalers and retailers to encourage the cooperation of wholesalers and retailers in this scheme, sharing part of its supracompetitive profits with them in exchange for their role in excluding generic competition and allowing those supracompetitive profits to continue.

## C.     Market Effects of Loyalty Programs

73.     Corteva and Syngenta have entered into loyalty agreements with all major wholesalers of CPPs in the United States, and in Syngenta's case, also retailers.  Corteva has entered into loyalty agreements with major wholesalers that are also major national retailers of CPPs.

74.     Since the major wholesalers have such a large market share of the traditional distribution channel and thereby control a very large share of all sales of CPPs to farmers, this gives Corteva and Syngenta's loyalty agreements a substantial marketwide effect and serves to greatly restrict competition for the Relevant CPPs, resulting in higher prices for farmers and increased profits for Corteva and Syngenta.

75.     The fact that the major wholesalers know that all of their competitors participate in these loyalty programs means that each major wholesaler knows that no one wholesaler will want to leave the loyalty program agreements and sell lower-priced generics instead, because this would undermine the entire scheme and jeopardize the large profits that the wholesalers obtain from the loyalty programs.

76.     Since the loyalty programs typically require that the wholesaler purchase a very high share (85% or more) of its CPPs containing a particular Relevant AI from Corteva or Syngenta or risk losing a very large incentive payment, wholesalers often avoid any risk of missing the required share by not

dealing with generic competitors at all, or by minimizing their purchases and interactions with them and their promotion of generic products.

77. Further, those small quantities of generic versions of the Relevant CPPs that are still able to be sold are significantly more expensive, due to the fact that output in those markets is significantly restricted and prices are artificially higher as a result, allowing generic manufacturers to price their products significantly higher than they would in the event of open competition.

78. Corteva and Syngenta each structured its loyalty program to promote adherence to loyalty thresholds and thus ensure that the practical effect of the program is to prevent the distribution of generic crop-protection products in substantial volumes. Each Defendant has described exclusion payments as profit-enhancing "rewards" for loyalty performance and support of branded products over generic products. Internal Syngenta planning documents depict its Key AI program as a way to generate "channel profit." This channel profit is contingent on the higher prices achieved through the exclusion of generic competition. And the exclusion payment is not in substance a discount—it is a payment in exchange for exclusivity.

79. Corteva and Syngenta each further designed their loyalty programs to minimize the likelihood that any distributor will undercut other distributors by passing exclusion payments on to farmers during the year in the form of lower transaction prices. Exclusion payments are generally made

as a single payment at the end of the year, and eligibility and payment calculations are complex, involving multiple products with varying active-ingredient contents. This complexity, uncertainty, and timing reduce the transparency of exclusion payments and make it less likely that a distributor will lower its prices in anticipation of receipt of a future (uncertain) exclusion payment. As one Corteva executive observed, program complexity "isn't necessarily a bad thing" and "[s]ome level of complexity helps customers maintain margins."

80.     Corteva has also recognized the effects of its loyalty program on prices of covered crop-protection products. An internal Corteva analysis concluded that its loyalty program was "best in class for generic defense," effective because it "[d]elays erosion in price and volume" for products subject to generic competition.

81.     Through these and other steps, Corteva and Syngenta have incentivized distributors to exercise extreme caution in dealings with generic manufacturers, lest they risk missing loyalty thresholds, and in some instances, distributors will not purchase from generic manufacturers at all. The consequences of missing a loyalty threshold can be so severe that distributors often have declined to purchase or promote generic products at all, have endeavored to exceed loyalty thresholds by a healthy margin, and have deferred purchases of generic products until the end of the season, in order to

minimize the risk of inadvertently missing a loyalty threshold, such as due to late-season returns or shifts in demand. Corteva and Syngenta strictly enforce the terms of their loyalty programs and rarely grant exceptions for missed payments without good cause.

82. Corteva and Syngenta have retaliated and threatened to retaliate in other ways against distributors that failed to satisfy applicable loyalty thresholds, including by canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage.

83. In or about 2014, Syngenta adopted a post-patent strategy to "aggressively defend [its] azoxystrobin share position while upholding market value." Syngenta projected that if it did not do so, including by deploying loyalty programs, both it and the traditional distribution channel would lose substantial revenues and profits due to downward pricing pressure from generic entry. On the other hand, were Syngenta to succeed in securing loyalty from a critical mass of the distribution channel, Syngenta projected that azoxystrobin pricing would remain flat for several years before beginning a slower descent. Syngenta anticipated that generic entry would in any event erode Syngenta's azoxystrobin prices and the corresponding "market value" to Syngenta, but that the erosion would be substantially more severe if it did not successfully implement its Key AI loyalty program and other generic counter-measures.

84.     To prevent the effects of unimpeded generic competition, Syngenta added azoxystrobin to its Key AI loyalty program, beginning in or about the 2013-2014 market year, with a 98% share threshold, *i.e.*, 2% open space. The threshold was gradually reduced over time to 92%, *i.e.*, 8% open space, where it stands today.

### 1.     Corteva CPPs Subject to Corteva's Loyalty Program

85.     Corteva's loyalty program includes CPPs using three specific active ingredients for which patent and regulatory exclusivities have expired: rimsulfuron, oxamyl, and acetochlor.

### i.     Rimsulfuron

86.     Rimsulfuron is an herbicide that is used to hinder weed growth in various types of crop fields including fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes. Sales of CPPs containing rimsulfuron in the United States totaled over $100 million in 2020. Rimsulfuron was originally developed, patented and registered with the EPA by Corteva predecessor DuPont.

87.     After Corteva's patent and regulatory exclusivity for rimsulfuron expired no later than 2007, generic manufacturers introduced generic versions of CPPs containing rimsulfuron that were priced significantly lower than Corteva's branded versions.

88.    Prior to the Dow-DuPont merger in 2017 that led to the formation of Corteva, DuPont successfully maintained a very high share of rimsulfuron sales through operation of its loyalty program.

89.    By the time of the merger, Corteva believed that its rimsulfuron business had become vulnerable to lower-priced generic competition.  It recognized that competing on price would risk a downward price spiral, so rather than lowering price, it placed rimsulfuron in its loyalty program beginning in the 2017-2018 market year.  Corteva's strategy involved maintaining both a high loyalty-program threshold and a price significantly higher than generic prices.

90.    However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing rimsulfuron, despite their products having the same active ingredient(s) and being much less expensive.

91.    In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers strictly limit purchases of CPPs containing generic rimsulfuron or do not purchase generics at all, do not promote generic CPPs containing rimsulfuron, and encourage their customers to buy Corteva's CPPs containing rimsulfuron rather than generic competitors' CPPs.

92.     This has effectively minimized generic competition for Corteva in the market for CPPs containing rimsulfuron.

93.     At least one generic manufacturer withdrew its rimsulfuron product and others canceled or deferred entry plans. A Corteva employee observed internally that its loyalty program has succeeded despite farmer demand for lower-priced generic products: "We have many growers who put generic on the bid but buy Matrix [Corteva's rimsulfuron brand] because nobody sells generic." In this way, Corteva has been able to achieve its stated generic defense objectives of maintaining volume, preserving margin, and slowing the decline in profits both for itself and for distributors.

94.     This greatly reduced competition has resulted in much higher profits for Corteva from CPPs containing rimsulfuron than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

### ii.      Oxamyl

95.     Oxamyl is an insecticide and nematicide used to control pests in various crop fields, particularly cotton fields and fruit and vegetable fields. Sales of CPPs containing oxamyl in the United States totaled over $30 million in 2020.

96.     After Corteva's patent and regulatory exclusivity for oxamyl expired in or around 1988, generic manufacturers introduced generic versions

of CPPs containing oxamyl that were priced significantly lower than Corteva's branded versions.

97.  A Corteva plant outage between 2015 and 2017 interrupted the supply of oxamyl products from Corteva.  At the time, oxamyl was not included in Corteva's loyalty program.  In response to the outage, the first generic oxamyl manufacturer entered the market in or about the fall of 2017.  Other generic manufacturers followed in or about 2018.  Given Corteva's plant outage and the absence of loyalty constraints, generic entrants were at first relatively successful.

98.  Following the 2017 Dow-DuPont merger, a Corteva integration planning team determined that the company's oxamyl business was threatened by generic competition, and planned a generic defense strategy to maintain profit margins and share.  Corteva added oxamyl to the new company's loyalty program, with the stated objective of maintaining "the vast majority of share," while still operating at "a price premium to generics (at all levels)."

99.  Corteva's loyalty program had the intended effect of reversing the initial success of generic manufacturers selling CPPs containing oxamyl.  Due to Corteva's loyalty program, the generic manufacturers' sales volumes plummeted, and generic manufacturers could not retain any significant market share in the market for CPPs containing oxamyl, despite their products having the same active ingredient and being much less expensive.  A Corteva product

manager responsible for oxamyl observed that generic competitors had curtailed or limited oxamyl imports and declared the program a success, stating: "[O]ur team truly has done an A+ job blocking generics."

100. In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers strictly limit purchases of generic CPPs containing oxamyl or do not purchase generics at all, do not promote generic CPPs containing oxamyl, and encourage their customers to buy Corteva's CPPs containing oxamyl rather than generic competitors' CPPs.

101. Corteva's conduct has effectively minimized generic competition in the market for CPPs containing oxamyl.

102. This greatly reduced competition has resulted in much higher profits for Corteva from CPPs containing oxamyl than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

### iii. Acetochlor

103. Acetochlor is an herbicide that inhibits weed growth particularly in corn fields, but also in fields of crops such as soybeans and sugar beets. Sales of CPPs containing acetochlor totaled over $695 million in 2020.

104. The EPA granted registration for acetochlor in 1994 to the Acetochlor Registration Partnership ("ARP"), a joint venture of basic manufacturers.

The ARP continues to hold the U.S. registration for acetochlor; its current partners are Corteva and Bayer. Bayer manufactures acetochlor for both parties.

105. Relevant patent protection for acetochlor expired in or about 2000, and the exclusive-use period under FIFRA expired no later than 2007.

106. In or about 2017, Corteva (then Dow) received reports that a generic manufacturer was planning to launch an acetochlor product in the United States. Corteva assessed the risk of generic acetochlor competition as potentially affecting two million acres and causing a 10-15% price devaluation across the market.

107. Rather than lower price in response to the perceived new competitive threat, Corteva implemented an acetochlor generic defense strategy. Corteva's strategy documents reflect its intent to use its loyalty program to "keep the channel locked up," to defend market share while holding the "value" of acetochlor products in the marketplace, and to "battle [the generic] in our core market and push them out" with the help of distributors.

108. Corteva added acetochlor to its loyalty program in the 2016-2017 market year. Under its loyalty program, Corteva has made exclusion payments to distributors to deter them from marketing significant volumes of competing, lower-priced generic acetochlor products.

109. Corteva and Bayer are partners in a joint venture that owns the U.S. registration for acetochlor; Bayer does the actual manufacturing of

acetochlor, and Corteva sells CPPs containing acetochlor that are subject to loyalty program agreements as described herein.

110.    After Corteva and Bayer's patent and regulatory exclusivity for acetochlor expired, generic manufacturers introduced generic versions of CPPs containing acetochlor that were priced significantly lower than Corteva's branded versions.

111.    However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing acetochlor, despite their products having the same active ingredient(s) and being much less expensive.

112.    In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers strictly limit purchases of generic CPPs containing acetochlor or do not purchase generics at all, do not promote generic CPPs containing acetochlor, and encourage their customers to buy Corteva CPPs containing acetochlor rather than generic competitors' products.

113.    This has effectively minimized generic competition for Corteva in the market for CPPs containing acetochlor and has also caused generic manufacturers to postpone or cancel introducing CPPs containing acetochlor to the United States market.

114. This greatly reduced competition has resulted in much higher profits for Corteva from CPPs containing acetochlor than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

115. Since the first generic acetochlor sales in or about 2018, generic manufacturers have made little headway with distributors. Even though one generic manufacturer offered acetochlor at prices substantially below Corteva's prices, major distributors have declined to purchase from the manufacturer as a result of Corteva's loyalty program.

116. Corteva's loyalty program has deterred generic manufacturers from introducing acetochlor products in the United States at all, or from offering innovative new products. This includes one generic firm that has achieved significant success in the sale of acetochlor products overseas, beyond the constraints of Corteva's loyalty program.

117. The presence of generic products in the market has constrained Corteva's pricing of its acetochlor products to a limited degree. But Corteva's prices remain significantly above prices of equivalent generic products and significantly above competitive levels. Corteva's loyalty program has resulted in higher prices for CPPs containing acetochlor than would prevail in a competitive market.

118.     Wholesalers and retailers have received loyalty payments from Corteva as a result of their cooperation with Corteva's restraint of trade and thereby profited from their willing participation in Corteva's scheme.

### 2.     Syngenta CPPs Subject to the Key AI Loyalty Program

119.     Syngenta's Key AI loyalty program includes CPPs containing three active ingredients for which patent and regulatory exclusivities have expired: azoxystrobin, mesotrione, and metolachlor (and s-metolachlor, as will be explained below).

### i.     Azoxystrobin

120.     Azoxystrobin is a fungicide that is used to kill and control fungal diseases on crops.

121.     After Syngenta's patent and regulatory exclusivity for azoxystrobin expired, generic manufacturers introduced generic versions of CPPs containing azoxystrobin that were priced significantly lower than Syngenta's branded versions.

122.     To prevent the effects of unimpeded generic competition, Syngenta added azoxystrobin to its Key AI loyalty program, beginning in or about the 2013-2014 market year, with a 98% share threshold, *i.e.*, 2% open space.  The threshold was gradually reduced over time to 92%, *i.e.*, 8% open space, where it stands today.  Under its loyalty program, Syngenta has made exclusion

payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic azoxystrobin products.

123. Due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing azoxystrobin, despite their products having the same active ingredient(s) and being much less expensive.

124. In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers and retailers strictly limit purchases of generic CPPs containing azoxystrobin or do not purchase generics at all, do not promote generic CPPs containing azoxystrobin, and encourage their customers to buy Syngenta's CPPs containing azoxystrobin rather than generic competitors' CPPs.

125. This has effectively minimized generic competition for Syngenta in the market for CPPs containing azoxystrobin and has also caused at least one generic manufacturer to not introduce an azoxystrobin product to the United States market.

126. At least two generic manufacturers have exited the market entirely. These two generic manufacturers abandoned azoxystrobin products after failing to achieve market success in the face of constraints imposed by Syngenta's loyalty program. At least one other generic manufacturer decided

against introducing an azoxystrobin product because of the lack of market access due to Syngenta's loyalty program.

127. In at least one instance, a generic manufacturer has been hindered in its attempt to market an innovative product containing azoxystrobin. This generic manufacturer sought to combine azoxystrobin with a different fungicide to target a market opportunity presented by particular crop diseases. Distributor customers were unwilling to purchase significant amounts of the product because the inclusion of azoxystrobin in the product could impact distributors' ability to meet Syngenta's loyalty threshold.

128. This greatly reduced competition has resulted in much higher profits for Syngenta from CPPs containing azoxystrobin than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

### ii.     Mesotrione

129. Mesotrione is a herbicide that controls common weeds in corn fields. Sales of CPPs containing mesotrione in the United States totaled over $740 million in 2020.

130. Mesotrione was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates). Syngenta's relevant patent protection for mesotrione expired in or about 2008, and Syngenta's exclusive-use period under FIFRA expired no later than 2014.

131.  After Syngenta's patent and regulatory exclusivity for mesotrione expired, generic manufacturers introduced generic versions of CPPs containing mesotrione that were priced significantly lower than Syngenta's branded versions.

132.  Among other steps, Syngenta added mesotrione to its Key AI loyalty program.  Mesotrione was first added to the program in or about the 2014-2015 market year, with a 99% share threshold, i.e., 1% open space. Syngenta gradually lowered the loyalty threshold over time, arriving at 92% (i.e., 8% open space) for the 2020-21 market year.  Under its loyalty program, Syngenta has made exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic mesotrione products.

133.  Due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing mesotrione, despite their products having the same active ingredient(s) and being much less expensive.  A generic manufacturer first introduced a mesotrione product in or about 2016.

134.  In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers and retailers strictly limit purchases of generic CPPs containing mesotrione or do not purchase generics at all, do not promote generic CPPs containing mesotrione, and

encourage their customers to buy Syngenta's CPPs containing mesotrione rather than generic competitors' CPPs.

135. This has effectively minimized generic competition for Syngenta in the market for CPPs containing mesotrione and has also caused at least two generic manufacturers to postpone or cancel introducing a mesotrione product to the United States market. A third developed a mixture product containing mesotrione, but dropped the product after the manufacturer was unable to make sufficient sales in the face of Syngenta's loyalty program.

136. This greatly reduced competition has resulted in much higher profits for Syngenta from CPPs containing mesotrione than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

137. Following expiration of patent and regulatory exclusivity terms protecting mesotrione, Syngenta faced a threat not only from generic manufacturers, but also from Corteva. A Corteva predecessor company developed a mixture product containing mesotrione and two other active ingredients.

138. Syngenta used its loyalty program to respond to this competitive threat. Specifically, Syngenta leveraged its ability to prevent distributors from purchasing significant quantities of products containing mesotrione from generic sources to obtain and maintain a supply agreement with Corteva.

139.    Under the Syngenta-Corteva supply agreement, Syngenta is the supplier of mesotrione that Corteva uses in mixture products, at specified prices.

140.    Together with Defendants' other anticompetitive conduct, the Syngenta-Corteva mesotrione supply agreement has harmed competition in the sale of CPPs containing mesotrione.

### iii.    Metolachlor

141.    Metolachlor is an herbicide that controls common weeds in various crop fields, including corn, soybeans, and sorghum.  Sales of CPPs containing metolachlor totaled over $470 million in 2020.

142.    Products containing "metolachlor" contain a 50-50 mixture of s-metolachlor and r-metolachlor, which have identical molecular makeups but are arranged differently (similar to a left and right glove).  Syngenta's CPPs contain predominantly s-metolachlor (88% s-metolachlor and 12% r-metolachlor).  CPPs using predominantly s-metolachlor are far more effective at killing weeds than CPPs that use the mixed version of metolachlor.

143.    After Syngenta's patent and regulatory exclusivity for metolachlor expired in or around 1996, generic manufacturers introduced generic versions of CPPs containing metolachlor that were priced significantly lower than Syngenta's branded versions.

144. After Syngenta's patent and regulatory exclusivity for s-metolachlor expired in or around July 2016, generic manufacturers introduced generic versions of CPPs containing s-metolachlor that were priced significantly lower than Syngenta's branded versions.

145. In or about the early 2000s, in response to anticipated generic competition on the original form of metolachlor, Syngenta added metolachlor to its Key AI loyalty program, with loyalty thresholds at or above 90% (i.e., 10% open space), and Syngenta's loyalty threshold stands at 90% today. Syngenta counts the original metolachlor and the s-metolachlor variant, which are commonly viewed as largely interchangeable at varying use rates, as a single active ingredient for purposes of its Key AI loyalty program. This means that there is a single loyalty calculation for the two variants, and a distributor that purchases too much original metolachlor from a generic manufacturer (as a proportion of its combined metolachlor and s-metolachlor purchases) risks forfeiting payments associated with Syngenta s-metolachlor products.

146. Due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the markets for CPPs containing metolachlor and s-metolachlor, despite their products having the same active ingredient(s) and being much less expensive. Generic manufacturers introduced products containing original metolachlor in or about 2003, but were unable to achieve significant market success. Other generic manufacturers

delayed or canceled introduction of metolachlor products as a result of Syngenta's loyalty program. There has also been more recent entry by generic manufacturers into the sale of CPPs containing s-metolachlor. But these manufacturers, too, have been marginalized by Syngenta's loyalty program.

147. In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers and retailers strictly limit purchases of generic CPPs containing s-metolachlor or do not purchase generics at all, do not promote generic CPPs containing s-metolachlor, and encourage their customers to buy Syngenta's CPPs containing s-metolachlor rather than generic competitors' CPPs.

148. This has effectively minimized generic competition for Syngenta in the market for CPPs containing metolachlor and s-metolachlor, and it has also caused generic manufacturers to postpone or cancel introducing metolachlor products to the United States market.

149. This greatly reduced competition has resulted in much higher profits for Syngenta from CPPs containing metolachlor and s-metolachlor than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

150. In at least one instance, a generic manufacturer was thwarted in its attempt to innovate with a product containing metolachlor. The generic manufacturer considered combining metolachlor with a different herbicide to

market a new mixture product. The manufacturer decided not to bring the product to market, however, because of concerns that Syngenta's loyalty program would prevent the manufacturer from gaining share in the United States.

151. The presence of generic products in the market has caused Syngenta to reduce prices of its metolachlor products to some degree. But Syngenta's prices remain significantly above prices of equivalent generic products and significantly above competitive levels. Syngenta's loyalty program has resulted in higher prices for CPPs containing metolachlor than would prevail in a competitive market.

152. As with mesotrione, Syngenta has maintained an agreement with Corteva (and its predecessor DuPont) for the supply of technical-grade and manufacturing-use s-metolachlor used in Corteva-branded products. This agreement has reduced the incentive for Corteva to challenge Syngenta's loyalty program by sourcing generic metolachlor or s-metolachlor at lower prices and, together with Defendants' other anticompetitive conduct, has harmed competition in the sale of CPPs containing metolachlor.

## RELEVANT MARKETS

153. At all relevant times, Corteva had market power and monopoly power in the markets for CPPs containing rimuslfuron and oxamyl; each year from at least 2017 through 2020, Corteva's share of sales in each of these

markets exceeded 70%. At all relevant times, Corteva had market power in the market for CPPs containing acetochlor. Corteva had the power to maintain the price of those CPPs at supracompetitive levels profitably without losing substantial sales to other products used for the same purposes as each of those CPPs.

154. At all relevant times, Syngenta had market power and monopoly power in the markets for CPPs containing azoxystrobin, mesotrione, metolachlor, and s-metolachlor. Syngenta had the power to maintain the price of those CPPs at supracompetitive levels profitably without losing substantial sales to other products used for the same purposes as each of those CPPs. Each year from at least 2017 through 2020, Syngenta's share of sales in each of the relevant markets for azoxystrobin, mesotrione, and metolachlor exceeded 70%.

155. Direct evidence of each Defendant's monopoly and market power in the relevant markets includes each Defendant's ability to price Relevant AIs and CPPs containing those Relevant AIs above competitive levels and to exclude competition from generic manufacturers through operation of its loyalty program.

156. Each Defendant's monopoly and market power is also shown through circumstantial evidence, including dominant or substantial market shares in relevant markets with substantial barriers to entry.

157. To the extent Plaintiffs' claims require the definition of a relevant market, the relevant product markets are the markets for EPA-registered CPPs for sale in the United States that contain each of the specific Relevant AIs. For example, for the Relevant AI azoxystrobin, the relevant product market is the market for EPA-registered CPPs for sale in the United States that contain azoxystrobin, including Syngenta's CPPs containing azoxystrobin and any generic versions of those CPPs.

158. To the extent Plaintiffs' claims require the definition of a relevant market, the relevant geographic market is the United States. The EPA has to approve CPPs for sale and use in the United States, and farmers in the United States are not allowed to legally use CPPs from other countries that have not been approved for sale and use in the United States. Therefore, the price of CPPs in other countries does not affect the market for CPPs in the United States.

159. The Defendants have very high market shares in the markets for CPPs containing each of the Relevant AIs, despite the fact that those CPPs do not currently possess patent and regulatory exclusivities. There are significant barriers to entry for generic manufacturers being able to enter the market for any CPP, in addition to patent and regulatory barriers, including the need for EPA registration, access to supplies of active and inactive ingredients, manufacturing facilities and know-how, and the ability to distribute products effec-

tively. Defendants' actions have also created further effective barriers to entry for generic competitors for the Relevant CPPs that prevents them from accessing the traditional distribution channel and being able to compete effectively in those markets.

160. For each of the Relevant CPPs, its only reasonable substitute is a generic version of that Relevant CPP. Other CPPs with different active ingredients will affect different types of weeds or pests, be suitable for different climate and weather conditions or types of crop fields, and/or have different modes of action in terms of the chemical and biological reactions they use to target particular weeds or pests and therefore would obtain different results than the particular Relevant CPP in question.

161. Azoxystrobin is differentiated from other CPPs used for similar purposes in that it can be used with all major row crops, making application easier, and it also is claimed to have growth-promoting effects on crops not proven in other active ingredients.

162. Mesotrione is differentiated from other CPPs used for similar purposes due to its greater efficacy and crop safety and lower use rate than other CPPs.

163. Metolachlor is differentiated from other CPPs used for similar purposes due to its greater solubility in water (which improves its performance

in drier conditions), its better performance in warmer conditions, and its ability to be used with a wider variety of crop fields.

164. S-metolachlor shares the advantages of metolachlor but has even greater efficacy in killing weeds.

165. Rimsulfuron is differentiated from other CPPs used for similar purposes due to the fact that it controls a wider spectrum of weeds, can be used with a wider variety of crop fields, can be used preemptively to prevent weed growth as well to control an existing weed problem, and is inexpensive to produce compared to other, similar herbicide active ingredients.

166. Oxamyl is differentiated from other CPPs used for similar purposes in that it is safer for crops and better for soil health, and it can be sprayed directly onto crops instead of applied at root level or in the soil.

167. Acetochlor is differentiated from other CPPs used for similar purposes due to its superior performance in wetter or cooler conditions, its greater efficacy against particular types of weeds, and its greater efficacy earlier in the growing season.

168. A small but significant and non-transitory artificial inflation of the price of any of the Relevant CPPs would not cause any significant number of consumers to purchase CPPs with different active ingredients so as to make such price inflation unprofitable. A small but significant and non-transitory artificial inflation of the price of any CPPs with different active ingredients

than the Relevant CPPs would not cause any significant number of consumers to purchase the Relevant CPPs instead so as to make the artificial price inflation unprofitable.

## ANTITRUST INJURY

169. Defendants Corteva and Syngenta's loyalty programs were intended to, and did in fact, exclude or minimize generic competition for the Relevant CPPs.

170. Due to Corteva and Syngenta's loyalty programs excluding or minimizing generic competition for each of the Relevant CPPs, Plaintiffs and other members of the proposed Class have had to pay and continue to pay artificially inflated prices for each of those Relevant CPPs and for their generic competitors as compared to the prices that would exist absent those loyalty programs if there was open competition from generic competitors across the distribution chain. This injury is ongoing.

171. Plaintiffs and other members of the proposed Class have sustained substantial losses and damage to their business and property in the form of those overcharges on their purchases of Relevant CPPs and their generic competitors. The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

172. The price of the Relevant CPPs and their generic competitors have been, and will continue to be, artificially inflated as a result of the Defendants'

anticompetitive conduct. The inflated prices that the Plaintiffs and other members of the proposed Class have paid for the Relevant CPPs and their generic competitors, and will continue to pay until Defendants' conduct ceases, are the foreseeable result of Defendants' anticompetitive conduct.

## CLASS ACTION ALLEGATIONS

173. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3) as representatives of a Class defined as follows:

> All persons or entities in the United States that purchased CPPs containing rimsulfuron, oxamyl, acetochlor, azoxystrobin, mesotrione, metolachlor, or s-metolachlor, manufactured by one or more of the Defendants, directly from any wholesaler or retailer that was subject to a loyalty program with Syngenta or Corteva during the period beginning at least as early as January 1, 2017 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period"). Excluded from the Class are: (1) any Judge or Magistrate presiding over the class action and members of their families; (2) Defendants and their subsidiaries, parents, successors, predecessors, or any entity in which Defendants have a controlling interest; (3) persons who properly execute and file a timely request for exclusion from the class; and (4) the legal representatives, successors, or assigns of such excluded persons.

Alternatively, Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3) as representatives of a Class defined as follows (the "Repealer Class"):

All persons or entities in Repealer Jurisdictions[4] that purchased CPPs containing rimsulfuron, oxamyl, acetochlor, azoxystrobin, mesotrione, metolachlor, or s-metolachlor, manufactured by one or more of the Defendants, not for resale, during the period beginning at least as early as January 1, 2017 until such time as the anti-competitive conduct alleged herein has ceased (the "Class Period"). Excluded from the Class are: (1) any Judge or Magistrate presiding over the class action and members of their families; (2) Defendants and their subsidiaries, parents, successors, predecessors, or any entity in which Defendants have a controlling interest; (3) persons who properly execute and file a timely request for exclusion from the class; and (4) the legal representatives, successors, or assigns of such excluded persons.

174. The members of the Class and the Repealer Class (collectively, the "Classes") are so numerous that joinder is impracticable. The Classes are each reasonably estimated to include hundreds of thousands of farms in the United States that purchased the Relevant CPPs and generic competitors to the Relevant CPPs during the Class Period.

175. Because the claims of each member of the Classes have a common origin and share a common basis, there are numerous questions of law and fact that are common to the Classes under Federal Rule of Civil Procedure 23(a)(2),

---

[4] A "Repealer Jurisdiction" is a state or district that has repealed the bar on indirect purchaser plaintiffs recovering under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and includes the following: Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

and that predominate over any issues affecting individual members of the Class under Federal Rule of Civil Procedure 23(b), including, *inter alia*:

a.    Whether Corteva conspired to restrain trade in the markets for CPPs containing rimsulfuron, oxamyl, and acetochlor;

b.    Whether Corteva's loyalty program was intended to exclude or minimize generic competition for CPPs containing rimsulfuron, oxamyl, and acetochlor;

c.    Whether Corteva's loyalty program did in fact exclude or minimize generic competition for CPPs containing rimsulfuron, oxamyl, and acetochlor;

d.    Whether Corteva's actions caused the retail price of CPPs containing rimsulfuron, oxamyl, and acetochlor to increase above competitive levels;

e.    Whether, after Corteva's lawfully obtained patent and regulatory exclusivities for CPPs containing each of rimsulfuron, oxamyl, and acetochlor had expired, it continued to have market power in the markets for CPPs containing each of those active ingredients;

f.    Whether, after Corteva's lawfully obtained patent and regulatory exclusivities for CPPs containing each of rimsulfuron and oxamyl had expired, it continued to have monopoly power in the markets for CPPs containing each of those active ingredients;

g.    Whether Corteva willfully acquired and maintained monopoly power in the markets for CPPs containing each of rimsulfuron and oxamyl, after its lawfully obtained patent and regulatory exclusivities on those CPPs had expired, by means of its loyalty programs;

h.    Whether Corteva's loyalty program has a legitimate pro-competitive justification;

i.    Whether the conduct alleged herein artificially maintained, preserved, or enhanced Corteva's market power in the

markets for CPPs containing each of rimsulfuron, oxamyl, and acetochlor;

j.  Whether Syngenta conspired to restrain trade in the markets for CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor;

k.  Whether Syngenta's loyalty program was intended to exclude or minimize generic competition for CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor;

l.  Whether Syngenta's loyalty program did in fact exclude or minimize generic competition for CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor;

m.  Whether Syngenta's actions caused the retail price of CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor to increase above competitive levels;

n.  Whether, after Syngenta's lawfully obtained patent and regulatory exclusivities on CPPs containing each of azoxystrobin, mesotrione, and metolachlor or s-metolachlor had expired, it continued to have market power in the markets for CPPs containing each of those active ingredients;

o.  Whether after Syngenta's lawfully obtained patent and regulatory exclusivities on CPPs containing each of azoxystrobin, mesotrione, and metolachlor or s-metolachlor had expired, it continued to have monopoly power in the markets for CPPs containing each of those active ingredients;

p.  Whether Syngenta willfully acquired and maintained monopoly power in the markets for CPPs containing each of azoxystrobin, mesotrione, and metolachlor or s-metolachlor, after its lawfully obtained patent and regulatory exclusivities on those CPPs had expired, by means of its loyalty programs;

q.  Whether Syngenta's loyalty program has a legitimate pro-competitive justification;

r.     Whether the conduct alleged herein artificially maintained, preserved, or enhanced Syngenta's market power in the markets for CPPs containing each of azoxystrobin, mesotrione, and metolachlor or s-metolachlor;

s.     Whether generic versions of CPPs containing rimsulfuron, oxamyl, and acetochlor were more expensive as a result of Defendants' anticompetitive actions as described herein;

t.     Whether generic versions of CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor were more expensive as a result of Defendants' anticompetitive actions as described herein;

u.     Whether Syngenta's conduct alleged herein was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

v.     Whether Corteva's conduct alleged herein was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

w.     Whether Syngenta's conduct alleged herein was a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

x.     Whether Corteva's conduct alleged herein was a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

y.     Whether Syngenta's conduct alleged herein was a violation of Section 3 of the Clayton Act, 15 U.S.C. § 14;

z.     Whether Corteva's conduct alleged herein was a violation of Section 3 of the Clayton Act, 15 U.S.C. § 14;

aa.     Whether Syngenta's conduct alleged herein was an unreasonable restraint of trade;

bb.     Whether Corteva's conduct alleged herein was an unreasonable restraint of trade;

cc.     Whether Syngenta's conduct alleged herein was a *per se* violation of the federal antitrust laws;

dd.     Whether Corteva's conduct alleged herein was a *per se* violation of the federal antitrust laws;

57

ee.  The operative time period and extent of Syngenta's antitrust violations;

ff.  The operative time period and extent of Corteva's antitrust violations;

gg.  Whether Syngenta fraudulently concealed its conduct;

hh.  Whether Corteva fraudulently concealed its conduct;

ii.  Whether Plaintiffs and members of the Class could reasonably have known about Defendants' conduct prior to the Federal Trade Commission filing its complaint in September 2022;

jj.  Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for the Relevant CPPs and generic competitors to the Relevant CPPs, and the proper measure of such overcharge damages; and

kk.  The appropriate injunctive and equitable relief for the Classes.

176. Plaintiffs will fairly and adequately represent and protect the interests of the Classes because of the common injury and interests of the members of the Classes and the uniform conduct of Defendants that is, and was, applicable to all members of the Classes. Plaintiffs have retained counsel competent and experienced in antitrust class action litigation that will adequately represent and protect the interests of the members of the Classes.

177. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) not only because common questions of fact and law predominate, but also because a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The prosecution of separate

actions by individual members of the Classes would impose heavy burdens upon the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes. Class action status, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

178.   Plaintiffs are not aware of any management difficulties that would preclude maintenance of this litigation as a class action. Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## CONTINUING VIOLATIONS AND FRAUDULENT CONCEALMENT

179.   A cause of action accrued for Plaintiffs each time Plaintiffs bought one of the Relevant CPPs or its generic competitors at a supracompetitive price caused by the Defendants' loyalty program scheme. And each sale of a Relevant CPP or its generic competitor at a supracompetitive price caused by the Defendants' loyalty program scheme constituted another overt act in furtherance of their anticompetitive scheme. Accordingly, even though certain of the loyalty programs described herein were entered into more than four years prior to the filing of this lawsuit, Plaintiffs are entitled to recover all

damages on all purchases by Plaintiffs of Corteva or Syngenta's Relevant CPPs or their generic competitors at supracompetitive prices within four years of the filing of this lawsuit.

180.   Due to Defendants' concealment of their unlawful conduct, however, Plaintiffs and members of the Class are entitled to recover damages reaching back even beyond four years of the filing of this complaint.  That Corteva and Syngenta entered into loyalty programs with wholesalers and retailers was not discoverable until after the Federal Trade Commission filed its complaint against Corteva and Syngenta in September 2022.  Plaintiffs and members of the Class had no knowledge of the Defendants' unlawful, self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years before the filing of this complaint.

181.   This is true because the nature of the Defendants' scheme was self-concealing and because the Defendants employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, their contracts, combinations, conspiracy and scheme.

182.   The Defendants wrongfully and affirmatively concealed the existence of their ongoing combination and conspiracy from Plaintiffs and members of the Class by, among other things, Corteva and Syngenta entering into contracts with wholesalers and retailers that were not publicly disclosed and

failing to disclose the means of operation of these loyalty programs in legally mandated public disclosure documents, such as Corteva and Syngenta's SEC filings.

183. Because the scheme and conspiracy were both self-concealing and affirmatively concealed by the Defendants, Plaintiffs and members of the Class had no knowledge of the scheme and conspiracy more than four years before the filing of this complaint; nor did they have the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

184. Plaintiffs and members of the Class also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred. Reasonable diligence on the part of Plaintiffs and members of the Class would not have uncovered those facts more than four years before the filing of this complaint.

185. As a result of the Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs' and Class members' claims have been tolled.

## CLAIMS FOR RELIEF

## COUNT ONE
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)
### (Against All Defendants)

186.    Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

187.    Defendants Corteva and Syngenta violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 by Corteva and Syngenta entering into unlawful loyalty program agreements with wholesalers and retailers that were intended to, and did in fact, restrain generic competition in the markets for the Relevant CPPs.  Further, Corteva and Syngenta entered into agreements with each other for the supply of mesotrione and metolachlor in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

188.    Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 injured the Plaintiffs in their business or property.  Plaintiffs and members of the Class were injured by paying higher prices for the Relevant CPPs and generic versions of the Relevant CPPs than they would have paid in the absence of those violations.

189.    The injuries of Plaintiffs and the Class are of the type that the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

190.   At all relevant times, Defendants Corteva and Syngenta possessed market power and/or monopoly power in the relevant market for each of the Relevant CPPs.  But for Defendants' wrongful conduct, as alleged herein, open competition from generic manufacturers of each of those Relevant CPPs would have greatly reduced prices at all points along the distribution chain, including the retail prices paid by Plaintiffs and members of the Class.

191.   Defendants Corteva and Syngenta entered into loyalty payment agreements with wholesalers and retailers under which Corteva and Syngenta made large payments to wholesalers and retailers in exchange for those whole-salers and retailers agreeing to minimize their purchases and sales of generic competitors to Relevant CPPs made by Corteva and Syngenta.  Further, Corteva and Syngenta entered into agreements with one another for the supply of mesotrione and metolachlor.  Corteva and Syngenta entered into these agreements in order to, and did in fact, unreasonably restrain trade in the markets for each of the Relevant CPPs, the purpose and effect of which was to: (a) prevent generic competitors for the Relevant CPPs from being able to access large parts of the market and (b) allow their own branded Relevant CPPs to be sold at significantly higher prices and still maintain most of the market, thereby artificially increasing the prices that Plaintiffs and other members of the Class would pay for each of the Relevant CPPs.  Corteva and Syngenta used the loyalty programs to divert a portion of their supracompetitive profits

from this restraint of trade, which resulted in higher prices and sales to the wholesalers and retailers in order to obtain their cooperation with the scheme.

192.    There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' conduct that outweighs its harmful effect on purchasers and competition.  Defendants' conduct can only be explained by anticompetitive motives and a desire to foreclose competition in the markets for the Relevant CPPs.  Even if there were some conceivable and cognizable justification, Defendants' loyalty program agreements were not necessary to achieve such a purpose.  Any supposed procompetitive benefits are false and pretextual and/or could have been achieved in a less restrictive manner.

193.    Further, those small quantities of generic versions of the Relevant CPPs that are still able to be sold are significantly more expensive, due to the fact that output in those markets is significantly restricted and prices are artificially higher as a result, allowing generic manufacturers to price their products significantly higher than they would in the event of open competition.

194.    As a direct and proximate result of Defendants' anticompetitive conduct involving the loyalty program agreements described herein, Plaintiffs and members of the Class were harmed.

195.    As a direct, material, and proximate result of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Plaintiffs and members of the Class have suffered injury to their business or property within

the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a), throughout the Class Period.

196.    Plaintiffs and members of the Class are entitled to treble damages for Defendants' violations of Section 1 of the Sherman Antitrust Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

197.    Defendants' unlawful conduct continues and, unless restrained, will continue.  Unless and until the activities complained of are enjoined, Plaintiffs and members of the Class will suffer immediate and irreparable injury for which they are without an adequate remedy at law.  Plaintiffs and members of the Class are also entitled to an injunction against Defendants preventing and restraining further violations, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT TWO
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) — MONOPOLIZATION
### (Against Corteva)

198.    Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

199.    The relevant product markets are the market for EPA-registered CPPs for sale in the United States that contain rimsulfuron, and the market for the EPA-registered CPPs for sale in the United States that contain oxamyl. The relevant geographic market is the United States.

200.    As a result of the scheme alleged herein, Corteva possesses monopoly power in the market for EPA-registered CPPs for sale in the United States that contain rimsulfuron and the market for EPA-registered CPPs for sale in the United States that contain oxamyl.

201.    Corteva willfully maintained its monopoly power in those markets even after its patent and regulatory exclusivities expired by means of the loyalty program scheme described herein, under which it made large payments to wholesalers and retailers in exchange for those wholesalers and retailers agreeing to minimize their purchases and sales of generic competitors to Corteva's CPPs containing rimsulfuron and oxamyl.

202.    Corteva's actions were carried out willfully and with the specific intent to maintain its monopoly power in those markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

203.    As a direct, foreseeable, and proximate result of Corteva's continuing violation of Section 2 of the Sherman Act, Plaintiffs and members of the Class have suffered injury and damages in the form of paying increased prices for EPA-registered CPPs containing rimsulfuron or oxamyl above those that would prevail in a competitive market in amounts to be proven at trial.

204.    There is no legitimate pro-competitive justification for Corteva's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

205.    As a direct, material, and proximate result of Corteva's violation of § 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period.

206.    Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from Corteva for these violations.  These damages represent the amount of Corteva's overcharges that the Class would not have paid absent Corteva's anticompetitive conduct alleged herein.  Damages will be quantified on a class-wide basis.  These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

207.    Plaintiffs, on behalf of themselves and other members of the Class, seek injunctive relief barring Corteva from engaging in the anticompetitive conduct alleged herein under § 16 of the Clayton Act.  The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

208.    Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent and flow directly from Corteva's unlawful, anticompetitive conduct.

## COUNT THREE
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) — MONOPOLIZATION
### (Against Syngenta)

209.    Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

210.    The relevant product markets are the market for EPA-registered CPPs for sale in the United States that contain azoxystrobin, the market for EPA-registered CPPs for sale in the United States that contain mesotrione, the market for EPA-registered CPPs for sale in the United States that contain metolachlor, and the market for EPA-registered CPPs for sale in the United States that contain s-metolachlor.  The relevant geographic market is the United States.

211.    As a result of the scheme alleged herein, Syngenta possesses monopoly power in each of those markets.

212.    Syngenta willfully maintained its monopoly power in those markets even after its patent and regulatory exclusivities expired by means of the loyalty program scheme described herein, under which it made large payments to wholesalers and retailers in exchange for those wholesalers and retailers agreeing to minimize their purchases and sales of generic competitors to Syngenta's CPPs containing azoxystrobin, mesotrione, metolachlor, and s-metolachlor.

213. Syngenta's actions were carried out willfully and with the specific intent to maintain its monopoly power in those markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

214. As a direct, foreseeable, and proximate result of Corteva's continuing violation of Section 2 of the Sherman Act, Plaintiffs and members of the Class have suffered injury and damages in the form of paying increased prices for EPA-registered CPPs containing azoxystrobin, mesotrione, metolachlor, and s-metolachlor above those that would prevail in a competitive market in amounts to be proven at trial.

215. There is no legitimate pro-competitive justification for Syngenta's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

216. As a direct, material, and proximate result of Syngenta's violation of § 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period.

217. Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from Syngenta for these violations. These damages represent the amount of Syngenta's overcharges that the Class would not have paid absent Syngenta's anticompetitive conduct alleged herein. Damages will

be quantified on a class-wide basis. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

218. Plaintiffs, on behalf of themselves and other members of the Class, seek injunctive relief barring Syngenta from engaging in the anticompetitive conduct alleged herein under § 16 of the Clayton Act. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

219. Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent, and flow directly from Corteva's unlawful, anticompetitive conduct.

**COUNT FOUR**
**VIOLATION OF STATE ANTITRUST LAWS IN THE ALTERNATIVE TO SHERMAN ACT CLAIMS**
**(Against All Defendants)**

220. Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

221. Plaintiffs bring this count on behalf of the Repealer Class.

222. Beginning at least as early as 2017, and continuing through the present, Defendants and distributors entered into a continuing agreement, understanding, and conspiracy, in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices the Relevant CPPs in the United States and

have maintained their monopoly power through a course of anticompetitive and exclusionary conduct.

223. Defendants' conduct has caused unreasonable restraints in the Relevant Markets.

224. As a result of Defendants' unlawful conduct, Plaintiffs and class members have been harmed by, among other things, paying inflated prices for the Relevant CPPs in each of the Repealer Jurisdictions.

225. By engaging in the aforementioned conduct, Defendants intentionally and wrongfully violated the following state antitrust laws:

a) Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by Class members and/or purchases by Arizona residents;

b) Cal. Bus. & Prof. Code §§ 16700, *et seq.*, with respect to purchases in California by Class members and/or purchases by California residents;

c) D.C. Code §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by Class members and/or purchases by District of Columbia residents;

d) 740 Ill. Comp. Stat. Ann. §§ 10/3(1), *et seq.*, with respect to purchases in Illinois by Class members and/or purchases by Illinois residents;

e) Iowa Code §§ 553.1, *et seq.*, with respect to purchases in Iowa by Class members and/or purchases by Iowa residents;

f) Kan. Stat. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Class members and/or purchases by Kansas residents;

g)  MD. Code Ann. §§ 11-204(A), *et seq*., with respect to purchases in Maryland by Class members and/or purchases by Maryland residents;

h)  Me. Rev. Stat. Ann. Tit. 10, §§ 1101, *et seq*., with respect to purchases in Maine by Class members and/or purchases by Maine residents;

i)  Mich. Comp. Laws Ann. §§ 445.771, *et seq*., with respect to purchases in Michigan by Class members and/or purchases by Michigan residents;

j)  Minn. Stat. §§ 325D.49, *et seq*., and 325D.57, *et seq*., with respect to purchases in Minnesota by Class members and/or purchases by Minnesota residents.

k)  Miss. Code Ann. §§ 75-21-1, *et seq*., with respect to purchases in Mississippi by Class members and/or purchases by Mississippi residents.

l)  Mo. Stat. §§ 407.010, *et seq*., with respect to purchases in Missouri by Class members and/or purchases by Missouri residents;

m)  Neb. Rev. Stat. §§ 59-1601, *et seq*., and Neb. Rev. Stat. §§ 59-801, *et seq*., with respect to purchases in Nebraska by Class members and/or purchases by Nebraska residents;

n)  Nev. Rev. Stat. §§ 598A.010 *et seq*., with respect to purchases in Nevada by Class members and/or purchases by Nevada residents;

o)  N.C. Gen. Stat. §§ 75-1, *et seq*., with respect to purchases in North Carolina by Class members and/or purchases by North Carolina residents;

p)  N.D. Cent. Code §§ 51-15-01, *et seq*., and N.D. Cent. Code §§ 51-08.1, *et seq*., with respect to purchases in North Dakota by Class members and/or purchases by North Dakota residents;

q)   N.M. Stat. §§ 57-1-1, *et seq.* with respect to purchases in New Mexico by Class members and/or purchases by New Mexico residents;

r)   N.H. Rev. Stat. Ann. Tit. XXXI §§ 356, *et seq.*, with respect to purchases in New Hampshire by Class members and/or purchases by New Hampshire residents;

s)   N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases in New York by Class members and/or purchases by New York residents;

t)   Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon by Class members and/or purchases by Oregon residents;

u)   6. R.I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases in Rhode Island by Class members and/or purchases by Rhode Island residents;

v)   S.D. Codified Laws §§ 37-1-3.1, *et seq.*, with respect to purchases in South Dakota by Class members and/or purchases by South Dakota residents;

w)   Tenn. Code §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by Class members and/or purchases by Tennessee residents;

x)   Utah Code §§ 76-10-911, *et seq.*, with respect to purchases in Utah by Class members and/or purchases by Utah residents;

y)   W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases in West Virginia by Class members and/or purchases by West Virginia residents; and

z)   Wis. Stat. § 133.01, *et seq.*, with respect to purchases in Wisconsin by Class members and/or purchases by Wisconsin residents.

226.   Plaintiffs and members of the Repealer Class have been injured in their business and property by reason of Defendants' anticompetitive conduct.

Their injury consists of paying higher prices for the Relevant CPPs than they would have paid in the absence of these violations. This injury is of the type that the state antitrust laws listed herein were designed to prevent, and directly results from Defendants' unlawful conduct. On behalf of themselves and the Repealer Class, Plaintiffs seek all appropriate relief provided for under the foregoing statutes.

## COUNT FIVE
## VIOLATION OF STATE CONSUMER PROTECTION LAWS IN THE ALTERNATIVE TO SHERMAN ACT CLAIMS
### (Against All Defendants)

227. Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

228. Plaintiffs bring this count on behalf of the Repealer Class.

229. Beginning at least as early as 2017, and continuing through the present, Defendants and distributors entered into a continuing agreement, understanding, and conspiracy, in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices the Relevant CPPs in the United States and have maintained their monopoly power through a course of anticompetitive and exclusionary conduct.

230. Defendants' conduct has caused unreasonable restraints in the Relevant Markets and constitute unfair, deceptive, or unlawful acts and business practices.

231.    As a result of Defendants' unlawful conduct, Plaintiffs and class members have been harmed by, among other things, paying inflated prices for the Relevant CPPs in each of the Repealer Jurisdictions.

232.    By engaging in the aforementioned conduct, Defendants intentionally and wrongfully violated the following state consumer protection laws:

a)      Cal Bus. & Prof. Code §§ 17200, *et seq*., with respect to purchases in California by Class members and/or purchases by California residents;

b)      D.C. Code §§ 28-4901, *et seq*., with respect to purchases in the District of Columbia by Class members and/or purchases by District of Columbia residents;

c)      Fla. Stat. §§ 501.201, *et seq*., with respect to purchases in Florida by Class members and/or purchases by Florida residents;

d)      Mass. Gen. Laws, ch. 93A, §§ 2, *et seq*., with respect to purchases in Massachusetts by Class members and/or purchases by Massachusetts residents;

e)      Mont. Code §§ 30-14-103, *et seq*., and §§ 30-14-201, *et seq*. with respect to purchases in Montana by Class members and/or purchases by Montana residents;

f)      Neb Rev. Stat. §§ 59-1602, *et seq*., with respect to purchases in Nebraska by Class members and/or purchases by Nebraska residents;

g)      Nev. Rev. Stat. §§ 598.0903, *et seq*., with respect to purchases in Nevada by Class members and/or purchases by Nevada residents;

h)      N.C. Gen. Stat §§ 75-1.1, *et seq*., with respect to purchases in North Carolina by Class members and/or purchases by North Carolina residents;

i) N.D. Cent. Code §§ 51-10-01, *et seq.*, with respect to purchases in North Dakota by Class members and/or purchases by North Dakota residents;

j) N.H. Rev. Stat. Ann. Tit. XXXI §§ 358-A:1, *et seq.*, with respect to purchases in New Hampshire by Class members and/or purchases by New Hampshire residents;

k) N.M. Stat. §§ 57-12-1, *et seq.*, with respect to purchases in New Mexico by Class members and/or purchases by New Mexico residents;

l) R.I. Gen Laws §§ 6-13.1-1, *et seq.*, with respect to purchases in Rhode Island by Class members and/or purchases by Rhode Island residents.

m) S.C. Code Ann. §§ 39-5-10, *et seq.*, with respect to purchases in South Carolina by Class members and/or purchases by South Carolina residents;

n) Utah Code Ann. §§ 13-11-1, *et seq.*, with respect to purchases in Utah by Class members and/or purchases by Utah residents; and

o) Vt. Stat Ann. tit. 9, ch. 63 §§ 2451, *et seq.*, with respect to purchases in Vermont by Class members and/or purchases by Vermont residents.

233. Plaintiffs and members of the Repealer Class have been injured in their business and property by reason of Defendants' unfair, unconscionable, and/or deceptive conduct. Their injury consists of paying higher prices for the Relevant CPPs than they would have paid in the absence of these violations. This injury is of the type that the consumer protection laws listed herein were designed to prevent, and directly results from Defendants' unlawful conduct. On behalf of themselves and the Repealer Class, Plaintiffs seek all appropriate relief provided for under the foregoing statutes.

## COUNT SIX
## VIOLATION OF § 3 OF THE CLAYTON ACT (15 U.S.C. § 14)
### (Against All Defendants)

234. Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

235. Pursuant to the Defendants' unlawful loyalty program agreements, they provided payments in the form of rebates to wholesalers and retailers in exchange for their agreement or understanding not to use or deal in the goods of the Defendants' generic competitors. This conduct substantially lessened competition and created monopolies in the Relevant CPPs, in violation of Section 3 of the Clayton Act (15 U.S.C. § 14).

236. As a result, generic competition to the Relevant CPPs was substantially restrained and the Defendants unlawfully maintained monopolies in the Relevant CPPs.

237. This conduct caused Plaintiffs and Class Members to pay higher prices for the Relevant CPPs than they would have paid in the absence of the Defendants' agreements with wholesalers and retailers.

238. Plaintiffs and the Class Members were injured and damaged because they purchased the Relevant CPPs at supracompetitive prices caused by the Defendants' violations of Section 3 of the Clayton Act.

239.   Plaintiffs and members of the Class have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing to engage in such conduct.

## COUNT SEVEN
## UNJUST ENRICHMENT
### (Against All Defendants)

240.   Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

241.   Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.  For example, Plaintiffs and Class Members paid higher prices for the Relevant CPPs than they would have paid in the absence of these violations.  Defendants' financial benefits resulting from their unlawful and inequitable conduct are economically traceable to overpayments for the Relevant CPPs.

242.   Defendants unjustly retained those benefits at the expense of Plaintiffs and Class members because Defendants' conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and the Class.

243.   The benefits that Defendants derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members.  It would be inequitable under unjust enrichment principles for Defendants to be permitted to

retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

244. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds they received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand a trial by jury and hereby respectfully request that this Court:

a. Certify this case as a class action on behalf of the proposed Classes pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), and appoint Plaintiffs as class representatives and their attorneys as class counsel;

b. Award Plaintiffs and each member of the Classes treble the amount of damages actually sustained by reason of Defendants' antitrust violations alleged herein, plus the reasonable costs of this action including attorneys' fees;

c. Order such equitable relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct; and

d. Award such other relief the Court deems reasonable and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial for all issues so triable.

Dated: March 29, 2023

Respectfully submitted,

/s/ Kenneth Kyre, Jr.
Kenneth Kyre, Jr.
N.C. State Bar Number: 7848
Richard L. Pinto
N.C. State Bar Number: 9412
Lyn K. Broom
N.C. State Bar Number: 17674
**PINTO COATES KYRE & BOWERS, PLLC**
3203 Brassfield Road
Greensboro, NC 27410
Telephone: (336) 282-8848
Fax: (336) 282-8409
kkyre@pckb-law.com
rpinto@pckb-law.com
lbroom@pckb-law.com

David E. Kovel
N.Y. State Bar Number: 4170114
Nicole A. Veno
N.Y. State Bar Number: 5144340
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
dkovel@kmllp.com
nveno@kmllp.com

Shomik Ghosh
N.Y. State Bar Number: 5626171
Michelle C. Clerkin
N.Y. State Bar Number: 4925087
**SPIRO HARRISON & NELSON**

7 World Trade Center, 46th Floor
250 Greenwich Street
New York, NY 10007
Telephone: (646) 880-8850
Fax: (973) 232-0887
sghosh@shnlegal.com
mclerkin@shnlegal.com

Jason C. Spiro
N.J. State Bar Number: 018382004
**SPIRO HARRISON & NELSON**
2 Bridge Avenue, Ste. 322
Red Bank, NJ 07701
Telephone: (862) 341-4804
Fax: (973) 232-0887
jspiro@shnlegal.com

David B. Harrison
N.J. State Bar Number: 039562007
Thomas M. Kenny
N.J. State Bar Number: 012792011
**SPIRO HARRISON & NELSON**
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
Telephone: (973) 232-4109
Fax: (973) 232-0887
dharrison@shnlegal.com
tkenny@shnlegal.com

Danielle F. Moriber
Florida State Bar Number: 119781
**SPIRO HARRISON & NELSON**
1441 Brickell Avenue, Suite 1400
Miami, FL 33131
Telephone: (786) 841-1181
Fax: (973) 232-0887
dmoriber@shnlegal.com

*Counsel for Plaintiffs and the Proposed Class*